EXHIBIT 1

## AGREEMENT

This Agreement ("Agreement") is made and entered into as of May 20, 2019 ("Effective Date") by and between Pure Valley Solutions, LLC, an Oregon company having a mailing address of 29975 S. Barlow Road, Canby, Oregon, 97013 ("Pure Valley"), and Third Wave Farms, LLC., a Kentucky corporation having a mailing address of 29 Browning Cemetery Road, Mount Vernon, Kentucky ("TWF", and collectively, the "Parties").

WHEREAS, TWF wishes for Pure Valley to process and provide winterized CBD oil ("Product"); and

WHEREAS, Pure Valley desires to process and sell the Product to TWF pursuant to the terms of this Agreement;

NOW THERFORE, in consideration of the mutual covenants and conditions set forth herein, TWF and Pure Valley agree as follows:

1. **Requirements; Rejection of Products**

1.1 **Requirements Contract.** Pure Valley shall contract with local farmers to cultivate approximately 100 acres of industrial hemp ("Crop") which shall be grown in accordance with all applicable laws, including the Agricultural Act of 2014 as amended by the Agriculture Improvement Act of 2018. Pure Valley shall process, test, and store the Crop in the Product in accordance with good and customary manufacturing practices prevailing in the industry and in strict compliance with the terms of this Agreement and the specifications and quality control standards set forth in Schedule 1 (as amended from time to time, the "Specifications"). TWF shall pay for the Product as provided for in Section 2.

1.2 **Purchase Minimum.** TWF is obligated to sell all Product which meets the Specifications and the other terms of this Agreement up to 5,000 liters. Should the Crop produce in excess of 5,000 liters of Product, TWF shall have the first right to purchase said excess Product in accordance with Section 2.2. And, upon 2 business days from Pure Valley notifying TWF of excess Product, TWF will give notice to Pure Valley whether or not they choose to exercise this right.

1.2.1 **First Option.** Pure Valley will have the option to pursue a higher price for any product produced. TWF will have first option to match the price or release Pure Valley to sell the product.

1.3 **Rejection of Product.** The Parties agree that TWF may reject or return Product within 30 days of invoicing which (a) does not fully comply with the Specifications; (b) have been damaged during storage or handling prior to TWF taking possession; or (c) are not in compliance with the other terms and conditions of this Agreement. In the event the product is not compliant with the specifications, Pure Valley reserves the right to test its retained samples at an accredited third party lab and in which the test results will be taken into consideration when determining fault of said rejection. If TWF has previously paid Pure Valley for Product which is later returned or rejected by TWF, TWF shall invoice Pure Valley, including all supporting documentation, for the cost of such rejected or returned Product and shall receive credit

from Pure Valley within 30 days of such invoice. TWF may elect to purchase Product which is not in compliance with the Specifications at its option and in accordance with Section 2.2.

1.4  **Testing, Compliance with Applicable Law and the Specifications.** All Product shall be tested in a duly accredited and licensed facility in strict compliance with the laws of the State of Oregon and shall be processed, packaged, and stored (a) under sanitary conditions and in strict compliance with all federal, state and local laws, rules, regulations and guidelines (including the Agricultural Act of 2014 as amended by the Agriculture Improvement Act of 2018); and (b) shall comply with the Specifications and the terms of this Agreement.

2.  **Price; Payment**

2.1.1  **Price.** TWF will make its best effort to sell all product that meets the specifications and quality control standards set forth in Schedule 1 at the originally agreed upon price of $2,000/L. If TWF is unable to purchase the oil at that price, it agrees to adhere to a minimum price of $1,800/L of product.

2.1.2  **Price Minimum.** Product price minimum shall be determined based on compliance with the Specifications as follows:

| Purity (% CBD) | Minimum Price per liter |
|---|---|
| >50 | $1800 |

2.2  **Noncompliant and Excess Product.** Excess Product and Product determined by any two of the Primary, Secondary or Tertiary Tests to be out of compliance with the Specifications may be purchased by TWF at TWF's election at a price to be determined at the time of sale by the Parties based on prevailing market rates.

2.3  **Payment.**

2.3.1  **Prepayment.** TWF is currently raising it final $2M in capital to this end. TWF shall prepay Pure Valley a nonrefundable $75,000 prepayment on or before June 30, 2019, $75,000 by July 15th, $100,000 by July 30th. If TWF completes the raise prior to these dates the total sum of $250K will be paid in full to Pure Valley. If TWF fails to complete the full $2M or raises only a portion of this TWF shall not be considered in default of the agreement and will not forfeit any money previously paid. The amount of funds paid will be prorated towards (Pre-Payment Credit) on the amounts paid to Pure Valley.

2.3.2  **Prepayment Credit.** Pure Valley shall credit TWF for the Prepayment by deducting 10% from all Product invoices until the full value of the Prepayment is reached ("Prepayment Deduction"). The Prepayment Deduction shall appear as a separate line item on all Pure Valley invoices.

2.3.3   **Invoicing.** Pure Valley shall invoice TWF after the Product has undergone testing in accordance with the Specification and shall attach testing reports thereto ("Primary Test"). Invoices shall be due and payable in full in advance of shipment.

2.3.4   **Revenue Share.** TWF will pay Pure Valley a 50% split of the revenue share payment from Unified Natural Product Solutions (UNPS) or Other customers upon sale of the isolate produced from all Pure Valley product.

2.3.5   **Test Results Dispute.** In the event TWF disagrees with the Primary Test results, it may, at its sole expense, retest the Product at a duly accredited and licensed facility and in strict compliance with the laws of the State of Oregon ("Secondary Test"). TWF shall provide the resulting test results to Pure Valley upon receipt. If Pure Valley accepts the Secondary Test results, it shall amend the Invoice in compliance with Section 2.1. If Pure Valley rejects the Secondary Test results, TWF and Pure Valley will work together to retest the Product in strict compliance with the laws of the State of Oregon at a mutually agreeable accredited and licensed facility ("Tertiary Test"). The expenses of any Tertiary Test shall be shared equally between TWF and Pure Valley. After the Tertiary Test, Pure Valley shall amend its Invoice to reflect a Price determined by the average result of the Primary, Secondary and Tertiary Test results.

3.   **Risk of Loss; Shipment; Storage.**

3.1   **Risk of Loss.** Risk of damage or loss to the Product shall remain with Pure Valley until the same is shipped F.O.B.

3.2   **Shipment.** All costs of shipment are the sole responsibility of TWF.

3.3   **Storage.** Pure Valley shall store Product for 21 days at the election of TWF at no additional cost. After 21 days, Pure Valley may charge TWF a storage fee at an amount equal to 1.5% daily of the Product price determined in accordance with Section 2.1.

3.4   **Abandonment.** Product in possession of Pure Valley more than 45 days from the date of invoicing shall be considered abandoned by TWF. Pure Valley shall have to right to resell abandoned product to a third party and invoice TWF for the difference between the Price and the amount actually received. Notwithstanding the forgoing, this does not release TWF from obligation under section 1.2 of this Agreement.

4.   **Term; Termination**

4.1   **Term.** This Agreement shall commence on the date hereof and continue in full force and effect the Crop has been fully harvested and processed into Product unless earlier terminated in accordance with the terms of this Agreement.

4.2   **Termination.** This Agreement may be terminated (a) by either party, if the other party commits a breach of any provision of this Agreement and such breach continues uncured for a period of thirty (30) days following written notice, (b) by either party, effective immediately, if the other party files, or has filed against it, a petition

for voluntary or involuntary bankruptcy or pursuant to any other insolvency law or makes or seeks to make a general assignment for the benefit of creditors or applies for or consents to the appointment of a trustee, receiver or custodian for its or a substantial part of its property or (c) by either party, in the event of a Force Majeure Occurrence (as defined below) affecting the other party which continues for more than forty-five (45) days.

    4.3    **Force Majeure.** In the event of riot, war, rebellion, fire, flood, act of God, terrorism, act of governmental authorities or any other cause beyond the control of the Parties hereto which renders it impossible for either Party to comply with the terms of this Agreement (a "Force Majeure Occurrence"), there shall be no liability for non-compliance caused thereby during the continuance thereof and any additional period of time reasonably necessary to remediate the effect of such Force Majeure Occurrence.

5.    <u>Miscellaneous</u>

    5.1    **Indemnification.** (a) TWF shall indemnify, defend and hold Pure Valley and its subsidiaries and affiliates and their respective officers, directors, employees, agents and representatives harmless, to the maximum extent permitted by law, from and against any and all claims, losses, damages, costs, expenses or other liabilities, including without limitation, reasonable attorney's fees (collectively, "**Losses**"), arising out of or relating to (i) actual or alleged injury to any person (including death) or property to the extent caused in whole or in part by TWF's negligence, (ii) non-fulfillment or breach by TWF of any agreement or covenant under this Agreement or (iii) the inaccuracy or breach of any warranty or representation made by TWF under this Agreement. (b) Pure Valley shall indemnify, defend and hold TWF and its subsidiaries and affiliates and their respective officers, directors, employees, agents and representatives harmless, to the maximum extent permitted by law, from and against any and all Losses arising out of or relating to (i) actual or alleged injury to any person (including death) or property to the extent caused in whole or in part by Pure Valley's negligence, (ii) non-fulfillment or breach by Pure Valley of any agreement or covenant under this Agreement or (iii) the inaccuracy or breach of any warranty or representation made by Pure Valley under this Agreement.

    5.2    **Governing Law.** This Agreement, as well as any claim concerning this Agreement or the enforceability thereof, whether in tort or contract, are to be construed in accordance with and governed by the internal laws of the State of Oregon without giving effect to any choice of law rule that would cause the application of the laws of any jurisdiction other than the internal laws of the State of Oregon to the rights and duties of the parties. The parties hereto acknowledge and agree that the laws of the State of Oregon bear a reasonable relationship to this Agreement.

    5.3    **Notices.** Any notice, request, demand or other communication required or permitted hereunder shall be in writing, shall reference this Agreement and, except as otherwise provided in this Agreement, shall be deemed to be properly given: (a) when delivered personally; (b) when sent by facsimile or electronic mail, with written confirmation of receipt by the sending facsimile machine; (c) three (3) business days after having been sent by registered or certified mail, return receipt requested, postage prepaid; or (d) two (2) business days after deposit with a private industry express

courier, with written confirmation of receipt. All notices shall be sent to the address set forth in the first paragraph of this Agreement (or to such other address or person as may be designated by a party by giving written notice to the other party pursuant to this Section).

5.4   Assignment. Neither Party shall assign, delegate or otherwise transfer this Agreement or any right or obligation hereunder (whether by express transfer, operation of law or otherwise) without the prior written consent of the other. Any attempted or purported assignment or other transfer not complying with the foregoing shall be null and void. Subject to the foregoing, this Agreement shall inure to the benefit of and bind the successors and assigns of the Parties.

5.5   Entire Agreement. This Agreement contains the entire understanding of the Parties with respect to the subject matter of this Agreement and merges and supersedes all prior and contemporaneous agreements and understandings between the Parties, whether oral or written, with respect to the subject matter of this Agreement. Any waiver, modification or amendment of any provision of this Agreement shall be effective only if in writing and signed by the authorized representatives of both parties.

5.6   Non-Waiver. It is understood and agreed that no failure or delay by any party in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any right, power or privilege hereunder.

5.7   Counterparts/Facsimile Signature. This Agreement may be executed in one or more counterparts, all of which together shall constitute a single agreement. This Agreement may be executed by facsimile or scanned image, and each such facsimile or scanned signature shall be treated for all purposes as an original.

5.8   Headings. The various section headings are inserted for convenience or reference only and shall not affect the meaning or interpretation of this Agreement or any section thereof.

5.9   Severability. If any term, provision, covenant or condition of this Agreement is held by a court or arbitral panel of competent jurisdiction to be invalid, void or unenforceable, the remainder of the provisions hereof shall remain in full force and effect and shall in no way be affected, impaired or invalidated.

5.10   Construction. This Agreement shall be deemed to have been drafted by all parties and, in the event of a dispute, no party hereto shall be entitled to claim that any provision should be construed against any other party by reason of the fact that it was drafted by one particular party.

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by their duly authorized representatives as of the Effective Date.

PURE Valley
Pure Valley Solutions, LLC

TWF
Third Wave Farms, LLC.

By: Crystal Fricker

Name: _(signature)_

Title: President

By: Trent Paasch

Name: Trent Paasch

Title: CEO

# SCHEDULE 1

## Specification on Sheet: Hemp Crude Oil

**Description**

Hemp Crude Oil consists of CO2 and/or ethanol hemp extract derived from legal industrial hemp biomass. Biomass is defined as dried flower, stem and leaf material.

### General Information

| Application and Use | Dietary Supplement |
|---|---|
| Composition | 100% crude hemp oil by weight |
| Organic status of raw materials | Extract: not certified |
| Organic Certification | Not certified organic |
| Storage and Shelf Life | 500 days from the date of production in original packaging. Store cool, dark and dry. |
| Packaging | 1 LL, 5 Gallon, 55 Gallon |

### Ingredients

| Ingredient | Hemp seed oil | Item Code | HSO |
|---|---|---|---|
| Botanical Name | Cannabis sativa | | Certified organic |
| Plant parts used in oil | | Country of Origin | USA |

| Ingredient | Hemp winterized CO2/Ethanol extract | Item Code | PP |
|---|---|---|---|
| Botanical Name | Cannabis sativa | Organic Certification | Not certified |
| Plant parts used in oil | Seed, stem and flower | Country of Origin | USA |

| Ingredient | Hemp CO2 extract | Item Code | PSO |
|---|---|---|---|
| Botanical Name | Cannabis sativa | Organic Certification | Not certified |
| Plant parts used in oil | Seed, stem, flower | Country of Origin | Colorado, USA |

### Specification

| Appearance | Greenish-brown, oily liquid |
|---|---|
| Odor | Grassy, earthy odor |
| Consistency | Viscous below 32 degrees Fahrenheit |
| Density | .92 g/mL - .93 g/mL |
| Solubility | Soluble in oils and ethanol |

### Assay

| Potency - Testing Methods: HPLC, UPLC, SFC, GC | |
|---|---|
| Total Cannabinoids | 50% Purity or Better |
| Tetrahydrocannabinol (THC) | < 0.3% |

| Heavy Metals - Testing Methods: ICP-MS | |
|---|---|
| Arsenic | < 50 ppb |
| Cadmium | < 20 ppb |
| Mercury | < 20 ppb |
| Lead | < 50 ppb |